UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

EARL B. GARVIN,                                    :

                          Petitioner,              :

          - against -                              :

DALE ARTIST,                                       :

                          Respondent.              :

--------------------------------------------------------x

┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____            │
│ DATE FILED:  12/8/2011               │
└─────────────────────────────────────┘

**REPORT AND**
**RECOMMENDATION**
**TO THE HONORABLE**
**PAUL A. CROTTY**[*]

08 Civ. 5285 (PAC) (FM)

**FRANK MAAS**, United States Magistrate Judge.

I.     Introduction

          In this proceeding, pro se petitioner Earl Garvin ("Garvin") seeks habeas

relief following his conviction on eight counts of Criminal Contempt in the First Degree

after a jury trial in Supreme Court, New York County.  The charges against Garvin arose

out of several harassing telephone calls that Garvin made to his wife in violation of an

order of protection.  On April 12, 2004, Justice Edward J. McLaughlin, before whom the

case was tried, sentenced Garvin, as a persistent felony offender, to eight indefinite terms

of twenty-five years to life to be served concurrently, but consecutively to a fifteen-year

sentence that Garvin already was serving.  (S. 30).[**]

--------------------

[*]          This Report and Recommendation was prepared with the substantial assistance of
Lauren K. Williams, a student at the Benjamin N. Cardozo School of Law.

[**]          "Ex." refers to the exhibits annexed to the declaration of Assistant Attorney
General Paul B. Lyons, dated Sept. 21, 2009 (ECF No. 18).  "Tr." refers to the trial transcript
(ECF No. 19).  "S." refers to the minutes of Garvin's sentencing on April 12, 2004 (attached to

(continued...)

In his amended petition ("Am. Pet." or "Amended Petition") (ECF No. 15), Garvin advances four claims. First, Garvin apparently contends that he was denied his Sixth and Fourteenth Amendment rights to a fair trial and to confront a witness against him because Justice McLaughlin barred him from the courtroom for part of the trial. (Am. Pet. ¶ 12 (Ground One)). Second, Garvin claims that he was denied his Sixth Amendment right to call a witness to testify on his behalf because his exclusion from the courtroom prevented him from testifying. (Id. (Ground Two)). Third, Garvin contends that he was denied the effective assistance of trial counsel, in violation of the Sixth Amendment, because his attorney failed to object to the prosecutor's reading of the minutes of his sentencing in connection with his prior conviction and to portions of Justice McLaughlin's jury instructions. (Id. (Ground Three)). Fourth, Garvin claims that his sentencing pursuant to the New York persistent felony offender ("PFO") statute violated his Sixth Amendment right to a jury trial. (Id. (Ground Four)).

For the reasons that follow, Garvin's Amended Petition should be denied. Additionally, because Garvin has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appeal should not issue.

---

[**](...continued)

Tr.). "Resp't's Mem." refers to the Respondent's Memorandum of Law in Opposition to the Petition (ECF No. 20). "Reply Mem." refers to Garvin's "Traverse in Opposition to Memorandum of Law" (ECF No. 25).

II.    Factual Background

A.    People's Case

The People's evidence at trial established as follows:

Garvin married Cheryl Leon ("Cheryl") in 1998 and they began living together in January 2002. (Tr. 235-36). In July 2002, Cheryl moved out of their shared apartment into her mother's apartment because she and Garvin were having "marital problems." (Id. at 236-37).

A few days after she moved, Cheryl was hospitalized for kidney problems, but refused to tell Garvin where she was being treated. (Id. at 239-40). During the week that Cheryl was in the hospital, Garvin was arrested on charges that included possession of a loaded firearm and criminal contempt. (See id. at 240, 358, 362). Cheryl was a potential witness against Garvin in that case, but never testified because Garvin entered a plea of guilty on February 13, 2003, in exchange for a promise that he would be sentenced to a maximum of ten years in jail. (See id. at 240-41, 243; Ex. C at 2-4). Justice Lewis Bart Stone, before whom Garvin entered his plea, conditioned that plea bargain on Garvin's compliance with certain conditions, one of which was that he adhere to orders of protection that had been imposed for the benefit of certain persons whom he had threatened, including Cheryl. (Ex. C at 15-17; Ex. D).

On July 3, 2003, Justice Stone sentenced Garvin to a fifteen-year term on the weapons charge and a concurrent two-to-four year term on the contempt charge. (Ex. E at 23). Justice Stone exceeded the previously-agreed sentence because he found that –

3

despite Garvin's protestations to the contrary – Garvin had violated the order of protection by telephoning Cheryl several times.  (See id. at 7-10, 13, 16-22).

At the conclusion of the sentencing, Justice Stone signed permanent orders of protection for the benefit of Cheryl and the other witnesses, which provided, insofar as relevant, that Garvin was to stay away from Cheryl at her home, school, business, place of employment and to "[r]efrain from communication or any other contact by mail, telephone, e-mail, voice mail or other means" with her.  (Ex. F; see Ex. E at 23).  The orders further prohibited any third party contact.  (Ex. F).  Garvin refused to sign any orders.  (Ex. E at 24).  After the Justice cautioned Garvin that any further contact with the witnesses might result in additional charges, the following heated exchange occurred:

| | |
|---|---|
| Garvin: | Ask me if I care. |
| . . . | |
| Court Officer: | Sit down.  Take a seat, Mr. Garvin |
| Garvin: | Don't matter.  I'm going to die in jail.  They all going to die.  Let the record reflect that Mr. Garvin threatened each and every one of them mother fuckers and that that bitch whole family be killed.  Let the record reflect that, your Honor. |
| The Court: | You want to give him the order of protection? |
| Garvin: | I ain't signing nothing. |
| | [To Assistant District Attorney Evan Krutoy]:  Fuck you too faggot.  Mr. Krutoy remember me.  I'm going to search for you until the day I die. |

(Id. at 23-24).  The transcript indicates that Garvin was then removed from the courtroom.

(Id. at 24).

        Cheryl worked for the New York City Buildings Department.  (Tr. 237).

When she returned to work after the July 4th holiday, on Tuesday, July 8, 2003, she

discovered a voicemail message from Garvin, who had called her on July 3rd from prison.

(Id. at 246, 304-05).  The message said, in part:

> Hey, you snake.  You know what they say you do to a snake,
> right?  You blow its fuckin' brains out and you cut their
> fuckin' head off. . . .  I'm still going to be home, bitch.  It
> ain't over.  You a silly mother fuckin' bitch. . . .  "Why the
> fuck you got to kill my kids?  Why you have to have my kids
> hurt?"
>
> I'm going to show you what type of nigger that I am,
> you silly ass bitch.
>
> Tell that to mother fuckin' Mr. Krutoy. . . .

(Id. at 222-23, 248, 255; Ex. G).***

        In November 2003, Cheryl discovered additional messages from Garvin on

her work voicemail.  (Tr. 247).  One such message, left on November 10, 2003, said, in

part:

> I don't even want to kill you bitch.  I just want to kill your
> kids.  When I get out of jail bitch I hope you have
> grandchildren.  If it takes me 20, 30, 40, or 50 mother fuckin'
> years bitch, I'm gonna kill Deion.  I'm going to kill

---

     ***     The Respondent has provided the Court with compact discs containing recordings
of each of the calls played for the jury.  (See Exs. G-I).

> Darrell.[****]  I hope they both got kids bitch.  I'm gonna kill all
> their kids.  I don't even want to kill you no more, you snake
> ass bitch. . . .

(Id. at 223, 249, 255; Ex. H).  Another message, left on the following day, November 11,

2003, said, in part:

> The only reason I didn't kill you and that silly nigger you had
> hiding in my house was because Deion was home.  I regret
> that.  I swear I regret that because now I'm going to kill Deion
> and Darrell. . . .  I swear to God on my momma and all of my
> children.  If I don't do nothing else in life I'm gonna kill
> Darrell and Deion.  Matter of fact, right, I'll tell you what,
> you so bold bitch, the next time you take Deion downtown to
> go get his haircut, I guarantee you some niggers will get at
> your faggot ass. . . .

(Id. at 224, 249, 255; Ex. H).

On two further occasions in November 2003, Shatrice Chrisolm, Garvin's

niece, received telephone calls from Garvin, which she admitted converting into three-

way conversations with Cheryl.  (Id. at 248, 253, 310).  That month, Garvin also left two

nonthreatening voicemail messages for Cheryl, the contents of which make clear that he

is the unidentified caller.  (See Ex. I).

At Rikers Island, where Garvin initially was lodged, detainees are required

to input book and case numbers ("BACs"), along with personal identification numbers

("PINs"), to place telephone calls.  (Tr. 280-81).  The prison does not use video cameras

to monitor who is using its telephones, but does keep logs indicating which BACs are

used to call specific telephone numbers.  (Id.).  These logs establish that Garvin's BAC

---

[****]   Deion and Darrell are Cheryl's children.  (Tr. 234).

6

was used to call Cheryl at her work number approximately six times while he was at Rikers Island prior to September 7, 2003.  (See id. at 279-82).  Garvin also used three other detainees' BACs to place calls to Cheryl's work phone.  (See id. at 284-85).[*****]

B.    Defense Case

Garvin did not present a defense case.

C.    Garvin's Presence and Participation During the Trial

The trial was brief, consuming only about 250 pages of transcript, including colloquy.  (See Tr. 211-460).  Garvin was present for all of voir dire and the first day of testimony.  (See id. at 63, 180).

At the beginning of the second trial day, after having had an opportunity to confer with his counsel, Garvin initially refused to leave his holding cell to attend the proceedings.  (Id. at 345).  Garvin's counsel noted that when he and Garvin spoke earlier that day, Garvin had wanted several things, including the record of a felony conviction that he believed Cheryl had, so that she could be recalled to the stand for further impeachment questioning.  (Id. at 345-46).  Counsel also speculated that Garvin was refusing to attend the trial because he wanted to be prepared further to testify.  (Id. at 347).

Justice McLaughlin declined to grant defense counsel a recess in which to prepare Garvin's testimony, observing (outside the jury's presence) that, "[i]f he's got truth on his side he doesn't need a whole lot of preparation.  If he doesn't have truth on

---

[*****]    Cheryl testified that she did not know these detainees.  (See Tr. 252-53, 284-285).

his side, I assume the jury will figure that out."  (Id. at 349-50).  The Justice nevertheless

instructed the jury to disregard Garvin's absence, stating that "[t]he defendant is not here.

He has a right not to be here.  Don't speculate about where he is or why he's not here, it's

not part of the evidence of this case."  (Id. at 354).

   The prosecutor next called as a witness the court reporter who had

transcribed the minutes of Garvin's guilty plea before Justice Stone.  After the reporter

read her transcript to the jurors, the prosecutor read them the transcript of Garvin's

sentencing in the prior case.  (Id. at 354-71).  The People then rested with Garvin still

absent from the courtroom.  (See id. at 371).

   Justice McLaughlin subsequently sent court officers to advise Garvin that

the People's case had concluded in his absence after one witness testified.  The court

officers further were instructed to tell Garvin that if he wished to testify, he needed to

come to court forthwith, or the lawyers would proceed with their summations.  (Id. at

365-66, 373).

   Following a brief recess, the court officers returned without Garvin.  One of

the court officers then advised the Justice that Garvin expressed a willingness to come to

court, provided that defense counsel came to see him, which request was fulfilled.  (Id. at

373, 445-46, 450).  As the officers began to escort Garvin, however, he head-butted an

officer and was returned to his cell.[******]  (Id. at 373-74, 450).  Based on the officer's

---

[******]   In an unsworn statement, Garvin claims that he did not head-butt the officer. According to his version of the events, after the officer attacked him, two other officers

(continued...)

8

explanation of what had transpired, Justice McLaughlin concluded that Garvin had

"voluntarily waived his right to be present during the trial."  (Id. at 375, see id. at 453).

Garvin consequently was not present for the remainder of the trial.  (See id. at 375, 411,

448, 451, 462-64).

     D.    <u>Jury Instructions</u>

        In his final instructions to the jury, Justice McLaughlin emphasized

repeatedly that it was the People's burden to establish Garvin's guilt beyond a reasonable

doubt.  (See, e.g., id. at 420 (presumption of innocence applies "until such time, if it

arrives, that you have been convinced by the proof submitted that he is guilty of one or

more of the charges to the standard known as reasonable doubt"), 421-22 (defining

reasonable doubt), 428 (stating that "[e]ach element [of the contempt charges] has to be

proven beyond a reasonable doubt," and that the People "are required to prove each and

every element beyond a reasonable doubt"), 429 ("It is alleged that Mr. Garvin did the

common elements [of the various contempt charges], each of which has to be proved

beyond a reasonable doubt.")).

        Justice McLaughlin also gave two instructions that Garvin considers

objectionable because they allegedly served to lower the prosecution's burden.  The first

of those instructions, relating to the so-called "two inferences" rule, was as follows:

> In a criminal case every accused is entitled to every factual
> inference in his favor reasonably drawn from the evidence.

---

      ******(...continued)
intervened to save him.  (Reply Mem. at 1-2).

> And where two inferences are drawn and both factual
> inferences are of equal strength and weight, one inference
> consistent with guilt and the other with innocence, any
> accused is entitled to a factual inference of innocence.

(Id. at 415).  The second challenged instruction related to an election analogy.  As Justice

McLaughlin explained:

> Now, when you get into the jury room there may be
> differences of opinion among you.  It's not unlikely that in
> this jury trial, like most jury trials, the people from whom
> the electorate and the jury pool come being the same.  You
> know that in an election, a close count of 50.1 beats 49.9
> each time and you're stuck with the winner, who may be a[]
> loser and in some judicial elections for fourteen long years.
> Yet, that same pool that produces close elections has for
> over 235 years virtually all of the time produced unanimous
> verdicts.

(Id. at 430).

    E.    <u>Conviction and Sentencing</u>

On February 27, 2004, the jury returned a verdict of guilty against Garvin

on eight counts of Criminal Contempt in the First Degree.  (Id. at 462-64).  Thereafter, on

April 12, 2004, Justice McLaughlin sentenced Garvin, as a persistent felony offender, to a

concurrent indeterminate term of twenty-five years to life on each count, which sentences

were to be served consecutively to the fifteen-year sentence that Garvin already was

serving as a result of his guilty plea to charges of unlawful possession of a firearm and

criminal contempt.  (S. 30).

F.      Subsequent Procedural History

1.      Motion to Set Aside Sentence

On March 22, 2004, Garvin's counsel moved to set aside Garvin's sentence pursuant to Section 440.20 of the New York Criminal Procedure Law ("CPL").  (Ex. J). Relying principally on Apprendi v. New Jersey, 530 U.S. 466 (2000), Garvin argued that his sentence was unconstitutional because Justice McLaughlin had enhanced it based on Garvin's two prior felony convictions.  (Id. at 5-6).  In Apprendi, the Supreme Court held that, "[ot]her than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi, 530 U.S. at 490.

On September 8, 2004, Justice McLaughlin denied Garvin's § 440.20 motion on the basis of People v. Rosen, 96 N.Y.2d 329 (2001), a decision in which the New York Court of Appeals concluded that the New York persistent felony offender statute did not violate the Supreme Court's holding in Apprendi.  (Ex. L).

2.      Direct Appeal

In May 2006, Garvin appealed his conviction to the Appellate Division, First Department.  (Ex. M).  In his brief, Garvin advanced three claims.  First, Garvin argued that the trial court had improperly allowed the prosecutor to present evidence of Garvin's prior "crimes and bad acts under invalid theories that showed that [he] had a criminal propensity to commit the crimes charged."  (Id. at 31; see id. at 31-54).  Second, Garvin claimed that the PRO sentence imposed by the court violated his rights to due

11

process and a jury trial under <u>Apprendi</u> and its progeny, <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), and <u>Ring v. Arizona</u>, 536 U.S. 584 (2002).  (Ex. M. at 55-60).  Third, Garvin contended that, even if his sentences were constitutional, they still were excessive in the absence of any evidence that Garvin actually had harmed anyone.  (<u>Id.</u> at 61-66).

On February 27, 2007, the Appellate Division unanimously affirmed the judgments of conviction.  <u>People v. Garvin</u>, 830 N.Y.S.2d 549, 550 (1st Dep't 2007).   In its decision, the court first held that the evidence of Garvin's prior crimes and bad acts was, with one exception, proper, because it explained the background leading to Garvin's telephone calls; was relevant to the issues of "motive intent, and identity," as well as the reasonableness of Cheryl's fear; and was not unduly prejudicial.*******  <u>Id.</u>  The court concluded, however, that the evidence that Cheryl knew of "a particularly violent act," for which Garvin "was not convicted" should not have been received.  <u>Id.</u>  Nevertheless, the court found that "any error in the receipt of this evidence . . . was harmless in light of the overwhelming evidence of [Garvin]'s guilt."  <u>Id.</u>  Finally, relying on <u>People v. Rivera</u>, 5 N.Y.3d 61 (2005), and <u>Rosen</u>, the court held that Garvin's sentence as a persistent felony offender was constitutional and not an abuse of discretion.  <u>Garvin</u>, 830 N.Y.S.2d at 550.

By letter dated March 6, 2007, Garvin sought leave to appeal to the New York Court of Appeals on each of the grounds previously argued before the Appellate

---

******* Justice McLaughlin twice instructed the jury that evidence of Garvin's prior crimes could not be considered as proof of his propensity to violate court orders or commit crimes.  (Tr. 367-68, 423).

Division.  (Ex. P).  On May 8, 2007, Judge Victoria A. Graffeo of the Court of Appeals denied that application.  People v. Garvin, 8 N.Y.3d 984 (2007).

        3.      Motion to Vacate Judgment

        On May 5, 2008, Garvin filed a pro se motion to vacate his judgment of conviction pursuant to CPL § 440.10(h).  (Ex. S).  Garvin claimed that he was denied the effective assistance of counsel in violation of the Sixth Amendment when his trial counsel failed to object to Justice McLaughlin's "two inferences" jury charge and to a second instruction that explained the requirement of a unanimous verdict by comparing jurors to voters in an election.  These instructions, Garvin contended, confused the jury and operated to lower the prosecution's burden from one that requires proof "beyond a reasonable doubt" to one that permits a conviction based on a "preponderance of the evidence."  (Id. ¶¶ 1, 4-5).  Garvin further claimed that his exclusion from the courtroom for part of the trial contravened his due process rights under the Sixth and Fourteenth Amendments to confront a witness against him and to testify on his own behalf.  (Id. ¶ 5).

        On November 19, 2008, Justice McLaughlin denied Garvin's § 410.10(h) motion.  (Ex. T at 3).  The Justice noted that the Appellate Division, First Department, had ruled in prior cases that neither an election analogy nor a "two inferences" instruction rendered erroneous a charge to a jury.  (Id. at 1-2 (citing, inter alia, People v. Alvarez, 864 N.Y.S.2d 410 (1st Dep't 2008))).  Based on this precedent, Justice McLaughlin concluded that the jury charge given at Garvin's trial was not constitutionally deficient and that trial counsel could not be ineffective for failing to object to correct instructions.

(Id.).  Justice McLaughlin next determined that, because he had failed to raise them in his direct appeal, Garvin could not bring his Confrontation Clause and right-to-testify claims for the first time in a motion to vacate his judgment of conviction.  (Id. (citing CPL § 440.20(2)(a))).  Finally, Justice McLaughlin noted that were he to rule on the merits of those claims, Garvin's exclusion from the courtroom was proper because "this court permitted defense counsel to communicate with defendant in the holding cell and gave defendant the opportunity to attend the trial on the next day."  (Id. at 3).

On April 29, 2009, Justice James M. Catterson of the Appellate Division, First Department, denied Garvin's request for leave to appeal.  (Ex. X).  That order was entered on May 5, 2009.  (Id.).

### 4.    Habeas Petition

Garvin timely filed his original petition on April 27, 2008.  (See ECF No. 1 at 6).  On September 4, 2008, I granted Garvin's request to stay further proceedings in this matter pending the outcome of his CPL § 440.10 motion, provided that he filed an amended petition within thirty days after exhausting his state court remedies with respect to that motion.  (ECF No. 7 at 2 (citing Zarvela v. Artuz, 254 F.3d 374, 381 (2d Cir. 2001))).  Garvin's Amended Petition is dated June 3, 2009.  (ECF No. 15).  The Respondent concedes that Garvin's Amended Petition is timely filed and that each of his claims was properly exhausted.  (Resp't's Mem. at 23).

III.   Discussion

    A.   Procedural Default

       Even though each of Garvin's habeas claims is exhausted, a federal court nevertheless is precluded from reviewing a claim if the state court's prior denial of that claim rested on an adequate and independent state ground.  E.g., Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 81 (1977).  In his decision denying Garvin's CPL § 440.10 motion, Justice McLaughlin cited CPL § 440.20(2)(a) as the basis for his determination that Garvin's Confrontation Clause and right-to-testify claims were procedurally defaulted because those issues "could have been raised on direct appeal based on the present record."  (Ex. T at 2-3).  As the Respondent correctly notes, the text of the Justice's opinion makes clear that the court meant to rely on subsection 2(c) of CPL § 440.10, which states that a trial judge "must deny a motion to vacate a judgment when . . . sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal . . . , adequate review of the ground or issue raised upon the motion," but "no such appellate review . . . occurred owing to the defendant's . . . unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him."  CPL § 440.10(2)(c).********

---

       ******** CPL § 440.20 permits a criminal defendant to file a motion to set aside a sentence as "unauthorized, illegally imposed or otherwise invalid as a matter of law."  CPL § 440.20(1).  Subsection 2 of that statute provides that the court must ordinarily deny such a motion when the ground or issue raised was determined on the merits as part of a prior appeal.  Id. § 440.20(2).  Here, of course, the Appellate Division never was asked to consider, and therefore had no occasion to decide, the issues raised in Garvin's pro se motion before Justice McLaughlin ruled

                                                (continued...)

"The federal courts have consistently held that decisions based on [CPL §] 440.10(2)(c) constitute adequate and independent state grounds" for the denial of a claim.  Collier v. Lee, No. 08-CV-3441 (NGG), 2011 WL 2297727, at *5 (E.D.N.Y. June 7, 2011) (quoting White v. West, No. 04-CV-2886 (RRM), 2010 WL 5300526, at *11 (E.D.N.Y. Dec. 6, 2010)).  Accordingly, Garvin may avoid his procedural default only if he is able to establish "[both] cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750 (1991); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); accord Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000).

To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously.  Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991).  The circumstances giving rise to cause include: (1) interference by government officials which makes compliance impracticable; (2) situations in which the factual or legal basis for a claim was not reasonably known by counsel; and (3) ineffective assistance of counsel.  See Carrier, 477 U.S. at 488; Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994).

---

******** (...continued)
on it.  Furthermore, there is no further subdivision in Subsection 2.  It thus seems clear that Justice McLaughlin intended to rely on CPL § 440.10(2)(c), rather than the statute he cited, as a basis to find Garvin's claims procedurally barred.

A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness. <u>Reyes v. New York</u>, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999) (citing <u>Carrier</u>, 477 U.S. at 494).

Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent." <u>Aparicio v. Artuz</u>, 269 F.3d 78, 90 (2d Cir. 2001) (citing <u>Coleman</u>, 501 U.S. at 748-50). As the Supreme Court has indicated, the "miscarriage of justice exception is concerned with actual as compared to legal innocence." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339 (1992)). A claim of actual innocence therefore must be supported by "new reliable evidence." <u>Schlup v. Delo</u>, 513 U.S. 298, 324 (1995).

In his papers, Garvin has failed to demonstrate cause for his default. Indeed, Garvin admits that he discussed his Confrontation Clause and right-to-testify claims with his appellate counsel, who promised to research them and include them in his brief if they had merit. (<u>See</u> Reply Mem. at 4). Counsel evidently then made a decision to omit those claims from Garvin's appellate brief and discouraged Garvin from submitting a <u>pro se</u> brief in which they were raised. (<u>See id.</u>). As a matter of law, counsel's reasoned decision not to raise either of these claims on appeal fails to constitute cause under <u>Wainwright</u>. <u>See</u> <u>Smith v. Murray</u>, 477 U.S. 527 (1986) (noting that a "deliberate, tactical decision not to pursue a particular claim is the very antithesis of the

kind of circumstance that would warrant excusing a defendant's failure to adhere to a State's legitimate rules for the fair and orderly disposition of its criminal cases").

Garvin similarly cannot demonstrate prejudice or that his conviction constituted a fundamental miscarriage of justice because the evidence overwhelmingly established his guilt and has not been countered by any evidence that he is actually innocent of the crimes charged.

Consequently, because Garvin has shown neither cause and prejudice nor a fundamental miscarriage of justice, his Confrontation Clause and right-to-testify claims are procedurally defaulted.

B.    <u>Merits</u>

Although a federal judge reviewing a habeas petition need only address claims that are fully exhausted and not procedurally barred, it is understandable that someone such as Garvin, who is serving a lengthy sentence, would wish to have the merits of all of his claims addressed.  More importantly, there is always the possibility (however remote) that another court might reach a different conclusion concerning the threshold issue of procedural default.  I therefore have considered the merits of all of the claims raised in the Amended Petition in this Report and Recommendation.  As set forth below, none of those claims warrants habeas relief.

1.    <u>Standard of Review</u>

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  <u>Herrera v. Collins</u>, 506 U.S. 390, 401 (1993).  Rather, a state

petitioner seeking habeas relief must show "that he is in custody in violation of the

Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The

petitioner bears the burden of proving, by a preponderance of the evidence, that his rights

have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

   Section 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), provides in part that:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the
> adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

   As the Second Circuit noted in Jones v. Stinson, the Supreme Court has

"construed the amended statute so as to give independent meaning to 'contrary [to]' and

'unreasonable.'  Under the 'contrary to' clause, a federal habeas court may grant the writ

if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court

on a question of law or if the state court decides a case differently than [the] Court has on

a set of materially indistinguishable facts."  229 F.3d 112, 119 (2d Cir. 2000) (citing

Williams v. Taylor, 529 U.S. 362, 412-13 (2000)).  Under the "unreasonable application"

clause, a federal habeas court should "ask whether the state court's application of clearly

established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  This

standard does not require that reasonable jurists would all agree that the state court was

wrong.  Id. at 409-10.  Rather, the standard "falls somewhere between 'merely erroneous

and unreasonable to all reasonable jurists.'"  Stinson, 229 F.3d at 119 (quoting Francis S.

v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

    Section 2254(d)(2) further authorizes the federal courts to grant a petition

for a writ of habeas corpus when a claim considered on the merits in state court "resulted

in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."

    Finally, to the extent that a habeas petition challenges factual findings,

section 2254(e)(1) provides that "a determination of a factual issue by a State court shall

be presumed to be correct" and that "[t]he [petitioner] shall have the burden of rebutting

the presumption of correctness by clear and convincing evidence."

    "If, after carefully weighing all the reasons for accepting a state court's

judgment, a federal court is convinced that a prisoner's custody . . . violates the

Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

    2.  Absence from Courtroom

    Garvin raises two claims arising out of his absence from the courtroom after

the first day of trial.  First, he alleges that Justice McLaughlin's decision to exclude him

from the courtroom deprived him of a fair trial.  (Am. Pet. ¶ 12 (Ground One)).  Second,

Garvin apparently contends that he was not given the opportunity to confront the

prosecutor, who, by reading the minutes of his sentencing to the jury, in effect became a

witness against him.  (Id.; Reply Mem. at 1-12).  Even if these claims were properly

before the Court, they would not provide a basis for habeas relief.

a.      Confrontation Clause

A criminal defendant's constitutional right to be present in the courtroom

during his trial is "rooted to a large extent in the Confrontation Clause of the Sixth

Amendment."  United States v. Gagnon, 470 U.S. 522, 526 (1985).  The Due Process

Clause of the Fourteenth Amendment also is implicated when the defendant's "absence

might frustrate the fairness of the proceedings."  Faretta v. California, 422 U.S. 806, 819

n.15 (1975).  A defendant nonetheless may waive the right to be present by knowingly

absenting himself from a trial.  Taylor v. United States, 414 U.S. 17, 19 (1973).

Similarly, a defendant may forfeit the right to attend if his behavior threatens to disrupt

the trial.  See Illinois v. Allen, 397 U.S. 337, 343 (1970).  Such a forfeiture can occur

even without any advance warning to the defendant.  Gilchrist v. O'Keefe, 260 F.3d 87,

97 (2d Cir. 2001).

Garvin does not appear to dispute that he refused to come to court at the

beginning of the second trial day.  He nevertheless maintains that it was not him, but the

court officers, who initiated the altercation that caused Justice McLaughlin to conclude

that he had forfeited his right to attend the trial.  (Reply Mem. at 1-2).  This assertion, first

made in Garvin's unsworn reply papers, hardly constitutes the sort of "clear and

convincing evidence" that would be necessary to set aside Justice McLaughlin's factual

findings, which must be presumed correct.  See 28 U.S.C. § 2254(e)(1).

21

In any event, even if the exclusion was improper, Garvin was not prejudiced.  The only witness to testify while he was absent from the courtroom was a court reporter who authenticated and then read into the record the minutes of Garvin's guilty plea on February 13, 2003.  (Tr. 355-64).  Those minutes were relevant because they helped explain Garvin's animus against Cheryl and showed that he had notice of the order of protection barring him from contacting her.  (Id. at 18-19, 367-68, 423); see Garvin, 830 N.Y.S.2d at 550 (citing People v. Thomas, 808 N.Y.S.2d 687 (1st Dep't 2006)).  Indeed, had the minutes been introduced during a federal criminal trial, the court probably could have taken judicial notice of them under Rule 201 of the Federal Rules of Evidence, or received them as a self-authenticating public record under Rule 902.  See Young v. Selsky, 41 F.3d 47, 50-51 (2d Cir. 1994) (concluding that it was appropriate for court of appeals to take judicial notice of prior sworn testimony not presented to the trial court); 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 902.03[2] (2011) (court records that bear an attestation but no seal also must be authenticated under Rule 901 "although this is rarely difficult").

The only other evidence proffered to the jury while Garvin was outside the courtroom was the minutes of Garvin's sentencing on July 3, 2003.  (Tr. 368-71).  Garvin was not present when the prosecutor read those minutes aloud, but he was in court the day before when a court reporter identified those minutes and they were received into evidence.  (See id. at 335-37).  Although Garvin contends that there were inaccuracies or elisions in the transcript which he would have challenged had he been present, he has not

explained what those were, much less how he might have challenged them without testifying on his own behalf.  It follows that, unless Garvin's claim regarding the alleged denial of his right to testify gives rise to a constitutional violation, he cannot establish that he was prejudiced by his absence from the courtroom while the transcripts of his guilty plea and sentencing were read to the jury.

b.    Right to Testify

The right to testify at one's criminal trial is not expressly set forth in the United States Constitution.  Brown v. Artuz, 124 F.3d 73, 76 (2d Cir. 1997).  In Rock v. Arkansas, 483 U.S. 44 (1987), however, the Supreme Court held that "the right to testify at one's criminal trial, although not found in the text of the Constitution, 'has sources in several provisions of the Constitution,' including the Due Process Clause of the Fifth and Fourteenth Amendments and the Compulsory Process Clause of the Sixth Amendment." Brown, 124 F.3d at 76 (quoting Rock, 483 U.S. at 51-52) (citations omitted).  "Moreover, '[t]he opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony.'"  Id. (quoting Rock, 483 U.S. at 52).

In his Amended Petition, Garvin contends that the jury should have been afforded an opportunity to hear his testimony "so they could compare [his] voice to the voice on the tape the [P]eople used on [their] direct case."  (Am. Pet. ¶ 12 (Ground Two)).  In his reply papers, Garvin elaborates on this theme, alleging that, "[b]ecause they knew it wasn't [Garvin's] voice on the tapes[,] not once did the trial court or assistant district attorney say[, ']I heard his voice[,] it's the same as the voice on the tapes.'"

23

(Reply Mem. at 14).  Garvin thus seeks to suggest that the trial judge and prosecutor conspired to keep him out of the courtroom so that he would be unable to establish his innocence.

Simply put, this claim is abject nonsense.  First, as the Respondent correctly observes, the telephoned threats were part of a continuing course of conduct which included threats made in open court before Justice Stone on July 3, 2003.  (Resp't's Mem. at 33).  In fact, the first of the calls giving rise to the charges against Garvin was made only hours after Garvin's outburst at his sentencing.  Moreover, the recordings of the calls (to which I have listened) clearly establish that one speaker left each of the messages for Cheryl and that the caller is her spouse.  For example, during one of the nonthreatening calls on November 13, 2003, the caller suggests that it will take a lot of work for Cheryl and he to rebuild their bridge, that he loves her with all his heart, and that, in two or three years, she might want a "trailer" visit with him.  (Ex. I).  Such trailer visits are, of course, available only to an inmate and his family members.  See Gadson v. Selsky, No. 94-CV-292 (RSP) (GJD), 1997 WL 159258, at *1 (N.D.N.Y. Apr. 4, 1997); N.Y.S. Dep't of Corr. & Cmty. Supervision, Directive No. 4500, available at http://www.docs.state.ny.us/Directives/4500.pdf.

During that same conversation, the caller also talks about the grandchildren Cheryl eventually may have, explaining that she could tell them that their grandfather could be "real spiteful."  (Ex. I).  There is, of course, no evidence to suggest that anyone

other than Garvin had been "spiteful" or, like Garvin, considered himself to be the father of Cheryl's children at the time of the calls.*********

As the Appellate Division correctly concluded, the evidence of Garvin's guilt was "overwhelming."  Garvin, 830 N.Y.S.2d at 550.  In light of that evidence, had Garvin exercised his constitutional right to take the stand as a defense witness, he clearly would not have been able to overcome the tape recordings and other evidence establishing that he was the person who placed the calls to Cheryl.  Consequently, even if Garvin had not forfeited the right to attend the trial and testify, the outcome would have been the same.  In such circumstances, any error that the trial court may have made with respect to Garvin's presence was harmless error.

### 3.  Ineffective Assistance of Counsel Claim

Garvin next claims that his trial counsel was ineffective.  (Am. Pet. ¶ 12 (Ground Three)).  To prevail on his ineffective assistance of counsel claim, Garvin must demonstrate that (a) his counsel's performance "fell below an objective standard of reasonableness" and (b) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).  Under Strickland, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  Therefore, a petitioner "must overcome the

---

********* Garvin is not the biological father of Cheryl's two children.  (Tr. 235).

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

A court considering an ineffectiveness claim need not "address both components of the [Strickland] inquiry if the [petitioner] makes an insufficient showing on one." Id. at 697. As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

Additionally, because this case involves a challenge to a state court's decision-making, Garvin "must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly." Bell v. Cone, 535 U.S. 685, 698-99 (2002) (citing Williams, 529 U.S. at 411). Rather, Garvin must show that the state courts "applied Strickland to the facts of his case in an objectively unreasonable manner." Id. at 699. Garvin has not met that burden.

a.   July 3, 2003 Sentencing Minutes

Garvin first claims that he was denied the effective assistance of counsel because his attorney failed to object when the prosecutor read the minutes of his earlier sentencing to the jury. (Am Pet. ¶ 12 (Ground Three)). Although defense counsel did not object anew at the time the sentencing minutes were read, he previously had "strongly" objected during a pretrial hearing, stating that this evidence was "overwhelmingly

prejudicial [and] totally unnecessary." (Tr. 15-16). Defense counsel also noted his continuing objection when the minutes of Garvin's sentencing were offered into evidence during a court reporter's testimony. (Id. at 337). Despite those objections, however, Justice McLaughlin held that the minutes were relevant because they "describe[d] some of the mental state of the accused, both at the time and in the context of what are the claimed, alleged future actions." (Id. at 18).

       Even if this Court were to assume that Justice McLaughlin's evidentiary ruling was incorrect, defense counsel twice had voiced objections to the People's use of the sentencing minutes. This was more than sufficient to preserve the issue for appeal. See CPL § 470.05(2) ("[A] party who without success has either expressly or impliedly sought or requested a particular ruling . . . is deemed to have thereby protested the court's ultimate disposition of the matter . . . sufficiently to raise a question of law with respect to such disposition . . . regardless of whether any actual protest thereto was registered."). Furthermore, because of his prior objections, Garvin's trial counsel may reasonably have concluded that a third objection in front of the jury just before the minutes were read would only have served to highlight the unfavorable nature of the evidence. If so, that decision clearly was a reasonable one.

       In any event, even if Garvin were able to show that his counsel was simply asleep at the switch, Garvin suffered no prejudice because the issue had already been adequately preserved. Garvin therefore cannot prevail on this branch of his ineffective assistance of trial counsel claim.

27

b.      Jury Charge

Garvin also claims that he was denied the effective assistance of counsel because his trial attorney failed to object to Justice McLaughlin's "two inferences" charge and a second instruction that likened the jury's deliberations to the actions of voters in an election.  Garvin alleges that both instructions had the effect of lowering the People's burden of proof, thereby allowing the jury to convict him based on a preponderance of the evidence, rather than a "beyond a reasonable doubt," standard.  (Am. Pet. ¶ 12 (Ground Three); Reply Mem. at 19-23).

To prevail on a jury charge claim, a habeas petitioner must show that he was deprived of a federal constitutional right.  Jackson v. Keane, No. 93 Civ. 5826 (LBS), 1994 WL 281831, at *4 (S.D.N.Y. June 23, 1994) (citing United States ex rel. Stanbridge v. Zelker, 514 F.2d 45, 50 (2d Cir. 1975)).  Consequently, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).  The appropriate question to ask is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp, 414 U.S. at 146-47) (internal quotation marks omitted).  A petitioner thus is not entitled to relief unless "there is a reasonable likelihood" that the jury misapplied the court's instructions in way that deprived him of due process.  Jones v. United States, 527 U.S. 373, 390 (1999).

28

Federal and state courts have repeatedly criticized both the "two inferences" charge and Justice McLaughlin's voting analogy.  The courts nevertheless have upheld convictions in cases in which these objectionable instructions were used.  See, e.g., United States v. Inserra, 34 F.3d 83, 91 (2d Cir. 1994) (entire charge "fairly conveyed to the jury the concept of proof beyond a reasonable doubt" despite inclusion of two-inference instruction); United States v. Attanasio, 870 F.2d 809, 818 (2d Cir. 1989) (concededly improper use of two-inference charge did not "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice"); United States v. Khan, 821 F.2d 90, 93 (2d Cir. 1987) (declaring that the two-inference language "should not be used," but affirming conviction); Jones v. Poole, No. 07 Civ. 6587 (LAP), 2009 WL 2633669, at *13 (S.D.N.Y. Aug. 26, 2009) (rejecting habeas challenge to both of Justice McLaughlin's instructions because "the state court decisions upholding [them] were well within the bounds of reasonable applications of and certainly were not contrary to clearly established federal law as determined by the Supreme Court of the United States"); People v. Fields, 87 N.Y.2d 821 (1995) (affirming conviction despite instruction that, "[i]f the evidence in the case reasonably permits a conclusion of either guilt or innocence, you should adopt a conclusion of innocence" because charge "as a whole" adequately "conveyed the correct standard"); Alvarez, 864 N.Y.S.2d at 410-11 (Justice McLaughlin's "reference to numerical majorities did not result in a constitutionally deficient jury instruction"); People v. Henderson, 865 N.Y.S.2d 97, 98 (1st Dep't 2008) (affirming conviction although Justice McLaughlin made inappropriate departures from

29

standard instructions); People v. Garcia, 788 N.Y.S.2d 599, 599-600 (1st Dep't 2005) (same).

In the course of denying Garvin's CPL § 440.10 motion, Justice McLaughlin noted that the Appellate Divsion previously had found that neither his voting analogy nor his "two inferences" charge "create[d] a constitutionally deficient reasonable doubt instruction."  (Ex. T at 1-2) (citing, inter alia, Alvarez and Henderson).  While this hardly constitutes a ringing  endorsement of these oft-criticized elements of the Justice's boilerplate instructions, as Chief Judge Preska noted in Poole, the United States Supreme Court has never issued a "decision provid[ing] a holding [regarding a charge] even remotely similar to the type of charge given by [Justice McLaughlin] in this case."  Poole, 2009 WL 2633669, at *13.  That, of course, is the only basis on which Garvin could secure habeas relief.  See 28 U.S.C. § 2254(d)(1).

In her decision in Poole, Judge Preska conceded that reasonable jurists could disagree as to whether Justice McLaughlin's instructions served to deny a criminal defendant a fair trial.  Id. at *17.  For that reason, Judge Preska issued a certificate of appealability.  Id.  On appeal, the Second Circuit therefore had an opportunity to consider whether Justice McLaughlin's instructions – including "the so-called 'two inferences' charge, and the instruction[] to the jury that when 'it finds a fact, it has to be done fifty-one to forty-nine'" – had the effect of "confus[ing] the jury about the state's burden of proof or . . . diminish[ing] its burden to something less than beyond a reasonable doubt." Jones v. Poole, 403 Fed. App'x 617, 619 (2d Cir. 2010) (footnote omitted).  The court

30

concluded that, "taken as a whole, the charge (though undesirable) adequately conveyed the prosecution's burden to the jury and was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent." Id. at 620 (citations omitted).

This ruling sounds the death knell for Garvin's assertion that Justice McLaughlin's boilerplate instructions deprived him of a constitutionally fair trial. Moreover, because the instructions were not constitutionally defective, defense counsel's failure to object to them obviously could not have prejudiced Garvin. See Palacios v. Burge, 589 F.3d 556, 566 (2d Cir. 2009) (because there was nothing unconstitutional about the show-up identification, defense counsel's failure to object to it was not unreasonable).

    4.   Sentencing Claim

Garvin's final claim is that N.Y. Penal Law ("PL") § 70.10, the PFO statute, pursuant to which he was sentenced, violates his Sixth Amendment right to a jury trial because Justice McLaughlin was permitted to make the determination that his sentence should be enhanced without putting the question to a jury. (See Am. Pet. ¶ 12 (Ground Four); Reply Mem. at 24 (citing Apprendi, Ring, and United State v. Booker, 543 U.S. 220 (2005))).

The PFO statute provides that a defendant may be sentenced as if he had committed a Class A-I felony if the court (a) finds that the defendant has two or more prior felony convictions for which a prison term of more than one year was imposed, and

(b) is of the opinion that "extended incarceration and life-time supervision will best serve the public interest" based on "the history and character of the defendant and the nature and circumstances of his criminal conduct."  PL § 70.10.  The court must find beyond a reasonable doubt through admissible evidence that the defendant is a PFO.  CPL § 400.20(5).  The decision that the defendant should be sentenced as an A-1 felon may be based on any non-privileged evidence, regardless of admissibility, but must be proved by a preponderance of the evidence.  Id.  Additionally, when the court believes that enhanced sentencing "will best serve the public interest," it must set forth the reasons for that opinion in the record.  PL § 70.10(2).

   After the cases upon which Garvin relies were decided, the Second Circuit considered the constitutionality of the PFO statute in Portalatin v. Graham, 624 F.3d 69 (2d Cir. 2010).  Sitting en banc, the court rejected an Apprendi challenge by three petitioners advancing claims similar to those made by Garvin.  Id. at 72.  The Second Circuit reasoned that it was bound by the New York Court of Appeals' conclusion that PL § 70.10 authorizes a sentence of fifteen years to life imprisonment "based on the defendant's predicate felony convictions alone."  Id. at 88 (quoting People v. Rivera, 5 N.Y.3d 61, 66-67 (2005)).  As the court explained:

> Whether our Court agrees or disagrees with the Court of Appeals' construction of New York law is of no moment.  As the Supreme Court has long held, state courts are the ultimate expositors of state law, and neither this Court nor any other federal tribunal has any authority to place a construction on a state statute different from the one rendered by the highest court of the State.

Id. at 89-90 (internal quotation marks, brackets, and citation omitted).  The court

therefore denied habeas relief.  (Id. at 91, 94).

On March 21, 2011, the Supreme Court declined the petitioners' requests

for a writ of certiorari in Portalatin.  See Morris v. Artus, 131 S. Ct. 1691 (2011); Phillips

v. Artus, 131 S. Ct. 1691 (2011); Portalatin v. Graham, 131 S. Ct. 1693 (2011).

Accordingly, because Portalatin remains the law of this Circuit, Garvin's sentencing

claim must be rejected.

IV.    Conclusion

For the foregoing reasons, Garvin's Amended Petition should be denied.

Additionally, a certificate of appealability should not issue because Garvin has failed to

make a the showing of the denial of a constitutional right required by 28 U.S.C

§ 2253(c)(2).

V.    Notice of Procedure for Filing of Objections to This Report and Recommendation

The parties are hereby directed that if they have any objections to this

Report and Recommendation, they must, within fourteen days from today, make them in

writing, file them with the Clerk of the Court, and send copies to the chambers of the

Honorable Paul A. Crotty, United States District Judge, and to the chambers of the

undersigned, at the United States Courthouse, 500 Pearl Street, New York, NY 10007,

and to any opposing parties.  See 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Any requests for an extension of time for filing objections must be directed to Judge

Crotty.  Any failure to file timely objections will result in a waiver of those objections for

purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. §636(b)(1); Fed.

R. Civ. P. 6(a), 6(e), 72(b).

Dated:        New York, New York
              December 8, 2011

                                        FRANK MAAS
                                 United States Magistrate Judge

Copies to:

Earl Garvin
DIN # 03-A-3850
P.O. Box 500
Elmira, New York 14901-0500

Paul Bernard Lyons
Assistant Attorney General
New York State Office of the Attorney General
120 Broadway
New York, NY 10271
Fax: (212) 416-8010

34